STATE OF MAINE                          SUPERIOR COURT
Penobscot, SS.                          Docket No. CV-08-220

                                        2AMM—PEN-12 / /20

R & R TOYS, INC.  d/b/a          )
SUNRISE HOME AND HEARTH          )
                    Plaintiff,   )
                                 )
                                 )
            v.                   )          JUDGMENT
                                 )
                                 )
BENJAMIN TIBBETTS, a/k/a         )
BOB TIBBS,                       )
                                 )
                                 )
            Defendant.           )

This matter came before the Court for a jury-waived trial on December 16 and 17, 2010.
Plaintiff was represented by Attorney Eric Mehnert. Defendant appeared pro se.
Plaintiff filed a three count complaint:  count I- conversion against Benjamin Tibbetts,
count II- conversion against Bob Tibbs, and count III breach of fiduciary duty. Mr.
Tibbetts filed a one count counterclaim alleging conversion by the Plaintiff.

Sunrise Home and Hearth was a business which sold wood and gas stoves and
accessories in Bangor, Maine. Beginning in late January of 2008 Defendant began
working as the manager of Sunrise Home and Hearth. Mr. Tibbetts had been employed
by Sunrise Home and Hearth in 2006-2007, and Shirley Bartlett[1] believed that he had the
skills to be a competent manager[2]. By May of 2008, Ms. Bartlett had suspicions about
the conduct of Mr. Tibbetts. Mr. Tibbetts was fired in early September, 2008.

In 2008 when Mr. Tibbetts started with Sunrise Home and Hearth, the business was
struggling. The Plaintiff owed several of its vendors and others (landlord). *See*
Defendant's *Exhibit #8*. Ms. Bartlett acquired her former husband's interest in the
business by assuming over a million dollars in debt, and in March of 2008 she secured a
$150,000.00 FAME loan to help stabilize the financial condition of the business[3]. *See Id.*

Mr. Tibbetts, as the manager, had responsibility for the operation of the Bangor store.
He earned $932.00 per week for his work. Mr. Tibbetts was charged with entering
inventory into the store's computer system, processing sales and work orders through

---

[1] It appears that Ms. Bartlett became the sole shareholder of the business after having acquired her former husband's
interest in March, 2008.

[2] Initially, Plaintiff and Defendant discussed Defendant acquiring an ownership interest in Sunrise Home and
Hearth, but Defendant eventually declined due to his belief that Sunrise's financial situation was unstable.

[3] As part of the security for the $150,000.00 loan, FAME took a 4th security position in Sunrise Home and Hearth,
behind two financial institutions that had priority for approximately $1,107,000.00.

1

the computer system, zeroing everything out on the computer system at the end of the day and making a daily bank deposit. He was also responsible to prepare certain financial reports. While Mr. Tibbetts may not initially have been asked to zero the system at the end of each day, the Court is satisfied that this task was assigned to him by the spring of 2008. It appears Mr. Tibbetts did not enter inventory into the computer system as requested, did not process sales and work orders through the system as requested by Ms. Bartlett, did not zero out the system daily and did not make daily bank deposits. He also did not provide Ms. Bartlett with the financial reports she requested, and this is one of the reasons Ms. Bartlett became suspicious about Mr. Tibbetts' conduct. Additionally, manufacturers began telling her that there were problems at the Bangor store.

Defendant was convicted of Class C theft in 2004 and two Class C thefts in 2007. In 2009, Defendant pled nolo contendre to a Class B theft from Sunrise Home and Hearth. The Court will not consider the conviction from 2009 based on a nolo plea for the purpose of establishing liability in this civil case. *See Olsen v. Correiro et. al.*, 189 F. 3d 52 (1999). The Court considers the felony convictions for the purposes of credibility.

In the spring of 2008 the price of oil had risen, and between March and August of 2008 sales increased at Sunrise Home and Hearth and a lot of new inventory was ordered. There were also a lot of backorders from manufacturers due to the increase in the number of orders placed with the manufacturers. The Court is satisfied that given his position as manager of the store, it was Mr. Tibbetts' responsibility to ensure the store inventory and sales were accurately reflected on the computer system. The Court finds that Mr. Tibbetts' failure to properly enter the inventory in the store's computer system and properly enter sales into the computer enabled him to sell and take inventory and cash from the store without immediate detection. Mr. Tibbetts' presentation of financial documentation at the trial suggests he was exceptionally well versed in the records and recordkeeping at Sunrise Home and Hearth.

Ms. Bartlett sent two "mystery shoppers" to the Bangor store. The first "shopper" bought a stove from Mr. Tibbetts at Sunrise Home and Hearth on August 26, 2008 and paid $1,800.00 cash for the stove. He left the store out the back door with a handwritten receipt. *See Plaintiff's Exhibit #2.* The $1,800.00 sale was not entered into the store's computer system, and the $1,800.00 went missing and was not accounted for in the bank deposit. The Court finds that Mr. Tibbetts took the **$1,800.00.**

On August 29, 2008, a second "mystery shopper", Roy Bickford, paid Mr. Tibbetts $900 cash in marked money for a stove and he also purchased two fire bricks. This sale was entered into the store's computer system without sales tax having been charged for the stove. *See Plaintiff's Exhibit #6.* When Mr. Tibbetts put the money in the cash drawer, Mr. Bickford observed that Mr. Tibbetts put the cash all together in the side of the cash drawer, rather than separating the $100s, $50s and $20s into the appropriate drawer slots. Later in the day, Mr. Tibbetts removed the Bickford sale from the computer system by entering a return of the product from Mr. Bickford. The $900 went missing and was not accounted for in the bank deposit. The Court finds that Mr. Tibbetts took the **$900.00.**

2

On August 26, 2008 Mr. Tibbetts removed $8,720.00 from Sunrise Home and Hearth's computer system (cash drop). *See Defendant's Exhibit #5.* There was no bank deposit made for $8,720 on August 26 or August 27, 2008. However, deposit slips for the prior eight days totaled exactly $8,720.00: August 18 - $420.00, August 19 - $5,700.00, and August 25 - $4,600.00. Without an overall picture of cash taken into the business (at least as entered into the computer system) as compared to cash deposits made into the business bank account over specified periods of time, the Court does not find sufficient evidence to determine whether Mr. Tibbetts is responsible for cash missing from deposits. While the Court agrees with the Plaintiff that multiple bank deposits before the entry documenting removal of the business cash is contrary to normal business practice and suggests manipulation by the Defendant, Plaintiff has not met her burden of proof in this regard.

There was also removal of $850.00 by Mr. Tibbetts from Sunrise Home and Hearth's computer system on August 12, 2008. See *Defendant's Exhibit #22.* There was no bank deposit for $850.00 on August 12 or August 13, 2008. *Id.* However, there was an $850.00 cash deposit into the Sunrise bank account on August 8, 2008. Again, without an overall picture of the cash drops (removal from the system) and cash bank deposits, the Plaintiff has not met her burden of proof with respect to the $850.00.

Upon Mr. Tibbetts departure from Sunrise Home and Hearth, links were found on the store computer system to a "Bob Tibbs" e-bay account. Ms. Bickford testified that she "believed" stoves were being sold through the e-bay account. While Mr. Tibbetts may have been selling stoves through this e-bay account, the evidence presented at trial was insufficient to support the Court making a finding in this regard.

Plaintiff argued that Mr. Tibbetts inappropriately handled the Christine King transaction. On April 25, 2008 he took a VISA payment from Christine King. *See Defendant's Exhibit #11 (work order).* Then, on August 12, 2008, he closed the transaction. *See Exhibit #11 (sales receipt).* If Christine King received the stove on August 12, 2008, then the August 12 transaction would have been appropriate. If Christine King did not receive her stove on August 12, 2008, then this entry would have either inappropriately "freed" a stove from inventory or made additional funds available in the system. Ms. Bartlett testified that she would "have to call the customer" to determine if she received her stove[4]. Setting aside the hearsay nature of what may have been the result of that call had it been made, given Ms. Bartlett's testimony, the Court does not find that Plaintiff met her burden of proof with respect to the King transaction.

Plaintiff also testified that if a customer paid for a stove with a credit card and a store employee later entered a cash return into the system when the stove actually had not been returned, then there would be extra "cash" in the system. However, Plaintiff did not have any evidence to support any particular occasions on which this occurred or any amounts involved.

A Sunrise stove was found in Defendant's apartment. The Court does not accept that this stove was intended to be installed in Defendant's landlord's building and that

---

[4] It may be that a call was placed to Ms. King at the time the insurance claim was made. The call apparently could have been made by Ms. Bartlett or Ms. Fournier.

payment would have been made thereafter. However, this stove was recovered, and thus no loss was sustained by Sunrise in this regard.

Ms. Bartlett believed that about 85 customers had placed deposits for stoves, but didn't receive the stoves. She believed that the average deposit was $2,000.00 and that $90,000.00 had been paid by customers who had not received their stoves. Ms. Bartlett tried to satisfy as many of these customers as she could before Sunrise Home and Hearth went out of business. When she was able to fill a customer's order, she removed the customer from the "work order report". Ms. Bartlett also testified that there was "some" accounting for the deposits; however, she did not give any dollar amount for the deposits that were properly placed into the business account. Since customers placing deposits for stoves ordered for them was a regular business practice, the crucial question is whether the deposits were put into the business account. The Court did not hear evidence to conclude how many of the deposits made by these 85 customers were still in the system when Defendant was fired. While "some" of the customer deposits may have been misappropriated, Plaintiff's conclusory testimony with respect to this aspect of her claim does not satisfy her burden to prove the amount of this loss.

Plaintiff loaned Defendant **$3,000.00**. Defendant has not re-paid the loan.

On August 5, 2008 Defendant made three sales of $528.05 and then cancelled the sales by entering a return for each of these three sales. One of the sales was listed as belonging to customer Garrold, another to Griffin and a third was simply given a number. *See Plaintiff's Exhibit #8.* The three returns were entered immediately after the three sales. *See Plaintiff's Exhibit #8.* Defendant conceded that having three sales in exactly the same amount for three different customers followed by three returns for these same three customers was highly unusual. The Court does not accept Defendant's later explanation that a customer named Peck (unnamed on the Tender Summary # 8) changed his mind, returned the $528.05 product and then purchased other items for $446.62. Moreover, this explanation would only account for one of the three sales/returns. Based upon all the evidence in this case, the Court finds that Defendant is responsible for the **$1584.15.**

Defendant's personal bank statements, found at the Plaintiff's store after Defendant had been fired, showed $9,000.00 of deposits between April 21 and May 18, 2010 and $10,000.00 of deposits between June 19, 2008 and July 20, 2008. *See Plaintiff's Exhibit #9 and Defendant's Exhibit #18.* While there could be multiple explanations for these deposits, the deposits are highly consistent with Mr. Tibbetts having taken property from Sunrise Home and Hearth (and/or doing private stove sales and installations).

Plaintiff argued that Mr. Tibbetts performed installation of stoves outside his work with Sunrise, despite his agreement not to do so. Plaintiff pointed to the one instance when she was aware Defendant performed an installation. However, both Plaintiff and Defendant agreed this installation was for Defendant's pastor, and there is no specific evidence to discredit Defendant's assertion that he performed the installation in a volunteer capacity for his church. Defendant's purchase of Cozy Stoves through his

4

personal account may also evidence Defendant performing private installations[5]. The amount of deposits into Defendant's personal account in July and August may also evidence Defendant performing private installations. However logical Plaintiff's argument, the Court does not find sufficient <u>evidence</u> that Mr. Tibbetts performed private installations (or if he did, the amount of business diverted from Sunrise Home and Hearth).

Plaintiff filed an insurance claim alleging a $125,000.00 loss due to employee theft. This claim was compiled through a review of business records by Mary Fortier with assistance from Ms. Bartlett and by calling customers and asking them about their transactions. While calling customers and inquiring about their store transactions was sufficient for the insurance claim, the court does not find the conclusions based on this review sufficiently reliable for purposes of determining the issues in this case, particularly in light of the lack of clarity with the business documents and specified errors[6].

Plaintiff may well have suffered other losses as a result of Defendant's conduct. However, it is plaintiff's burden to prove her case by a preponderance of the evidence. The lack of knowledge by Ms. Bartlett about the business records, Ms. Bartlett's conclusory testimony about the business transactions and records, and the errors in/questions raised with respect to some of the conclusions all hamper plaintiff's evidentiary presentation. There was no forensic reconstruction of the business transactions and records. There was no reconstruction of the number of stoves in Plaintiff's inventory when Defendant started, the number purchased and sold during Defendant's employment, and the number in inventory when Defendant was fired (or other similar reconstruction). The Court has been asked to draw wide-sweeping conclusions from a few discrete transactions (about which there are questions). Additionally, Sunrise Home and Hearth had at least three employees in addition to Mr. Tibbetts. It was a regular practice, known by Ms. Bartlett, that the employees entered information into the store's computer system under each others log ins. Ms. Bartlett acknowledged that the computer system was "full of errors". Therefore, the Court does not award Plaintiff any damages other than the damages specified above.

Through his questions, Mr. Tibbetts seemed to suggest that Ms. Bartlett had fabricated or embellished her accounting of losses and/or falsified her insurance claim due to the financial condition of the business. The Court does not find that Ms. Bartlett fabricated or embellished her accounting or falsified her insurance claim in any way. Rather, the Court finds that she did her best to calculate the business losses in a business where there was not adherence to proper procedures and a business which she did not manage on a day-to-day basis. While the Court has not accepted Plaintiff's conclusions about the amount of the loss to the business, this is because the Court did not find the

---

[5] The Court does not find that Plaintiff authorized Defendant to use his personal checking account to conduct regular store business.

[6] The Court is satisfied that 15 Saranac stoves were received by Sunrise and that some of them were sold to customers. *Compare Defendant Exhibits # 12 and 13 and Defendant's Exhibit 10.*. This discrepancy, among others, caused the Court to find the ultimate general conclusions reached by the Plaintiff about the amount of the loss not sufficient to satisfy her burden of proof.

conclusions sufficient to satisfy her burden of proof (and not because the Court thought Ms. Bartlett fabricated or falsified her conclusions).

The Court finds that Defendant breached his duty to Sunrise Home and Hearth. While the breach of his recordkeeping duties promoted his ability to convert the Plaintiff's property, the breach of his recordkeeping duties did not independently cause damage to the Plaintiff. When defendant was hired, plaintiff was aware of his criminal conviction(s) and accepted his representation that he had cleaned up his life. Plaintiff was also aware that employees at the Bangor store were not adhering to company policy to log out of the computer system when they had finished a transaction. Plaintiff was also aware that reports were not being generated as requested from the Bangor store.

"In order to recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant acted with malice." *Tuttle v. Raymond*, 494 A.2d 1353, 1354 (Me. 1985) (*cf Newbury v. Virgin*, 2002 ME 119)(Defendant intended to drive plaintiff out of business so defendant could start a similar business of his own at the location in question). Malice can be express or implied. *Id.* at 1361. Express malice exists "where the defendant's tortious conduct is motivated by ill will toward the plaintiff." *Id.* Malice also exists "where deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied." *Id.* Implied malice is not established "by the defendant's mere reckless disregard of the circumstances." *Id.* In this case, there is no particular evidence that defendant's conduct was motivated by ill will. While the evidence establishes that Defendant took money that did not belong to him, not every employee theft justifies an award of punitive damages. To prove "malice", Plaintiff must prove that Defendant's conduct was sufficiently culpable or "outrageous" such that malice should be imputed. Plaintiff argued that punitive damages should be awarded as Defendant's conduct drove the Plaintiff out of business, left many customers without the products for which they had placed deposits and caused Ms. Bartlett's personal bankruptcy.

Given the lack of a depth of knowledge by Ms. Bartlett about the business records, Ms. Bartlett's conclusory testimony about the business transactions and records, the questions raised about some of the conclusions reached by Ms. Bartlett, the admitted failure of Sunrise employees to adhere to policy about logging out of the computer system, Ms. Bartlett's knowledge that she was not receiving the financial reports from the Bangor store that she had requested, the amount of the award in this case, the very tenuous financial position of the business prior to Mr. Tibbetts' employment as the manager, and the significant amount of money deposited in the business account between January and August of 2008 (*see Defendant Exhibits #15 and 16*), the court is not satisfied that an award of punitive damages is appropriate. Ms. Bartlett was also in a very tenuous financial condition personally before Mr. Tibbetts became manager of the Bangor store.

There is no legal basis to award attorney fees to the plaintiff.

Defendant filed a counterclaim alleging that Sunrise Home and Hearth kept his tools and other property after he was fired. *See Defendant's Exhibit #9A*. Ms. Bartlett testified

6

that she hadn't seen the tools at Sunrise Home and Hearth. The Court is not satisfied that tools or other property belonging to the Defendant were at Sunrise Home and Hearth when Mr. Tibbetts was fired (other than 2 of his personal checking statements). Therefore, Defendant did not meet his burden of proof on his counterclaim. Moreover, even if tools and other property of the Defendant were left at Sunrise when Mr. Tibbetts was fired, Mr. Tibbetts did not prove any value of this property and his claim fails for this reason as well.

Judgment for the Plaintiff in the amount of $ 7,284.15 on Count I ($1800.00 + $900.00 + $1584.15 + $3000.00).
Judgment for the Defendant on Count II.
Judgment for the Plaintiff on Count III with a $0.00 award. All damages proven by the Plaintiff were awarded in Count I.
Judgment for the Plaintiff on Defendant's Counterclaim.

This Order shall be incorporated upon the docket by reference.

Dated: January 21, 2011

Ann M. Murray,
Justice, Maine Superior Court

Judgment entered upon the docket on 1/28/11.

7